IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

**MARY ANNA BALL,**

    **Plaintiff,**

v.                                                        Case No.: 3:13-cv-06069

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

    **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, that the Commissioner's motion for judgment on the pleadings be **GRANTED**, and that this case be **DISMISSED**, **with prejudice,** and

1

removed from the docket of the Court.

I. **Procedural History**

On July 18, 2011, Plaintiff, Mary Anna Ball ("Claimant"), filed an application for DIB, alleging a disability onset date of July 11, 2011 due to osteoarthritis, varicose veins, carpal tunnel syndrome, hearing loss, anxiety, and chronic obstructive pulmonary disease. (Tr. at 125, 157). Her application was denied initially and upon reconsideration. (Tr. at 11). Claimant subsequently requested and received a hearing before an Administrative Law Judge ("ALJ"), I. K. Harrington, who determined on November 29, 2012 that Claimant was not disabled under the Social Security Act. (Tr. at 11-20). The ALJ's decision became the final decision of the Commissioner on February 12, 2013, when the Appeals Council denied Claimant's request for review. (Tr. at 1–3). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 8, 9, 10, 11, 12). Consequently, the matter is fully briefed and ready for resolution.

II. **Claimant's Background**

Claimant was 60 years old at the time she filed the instant application for benefits. (Tr. at 125). She is a high school graduate and communicates in English. (Tr. at 43, 156). Claimant has prior relevant work experience as a money counter/money room clerk at a local greyhound race track. (Tr. at 158).

III. **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason

of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the

3

claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since July 11, 2011, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "osteoarthritis, degenerative disc disease; carpal tunnel syndrome, chronic obstructive pulmonary disease, moderate sensorial neural hearing loss, early thromboangitis obliterans, depression, anxiety." (Tr. at 13-14, Finding No. 3). She considered Claimant's other complaints and decided that the remaining impairments were either non-severe or not medically determined. (*Id.*).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-16, Finding No. 4). Accordingly, she assessed Claimant's RFC as:

> limited to light work except she is limited to occasional climbing, stooping, kneeling, crouching, crawling, no balancing, frequent feeling; she is to avoid concentrated exposure to cold and heat, vibration, fumes, odors, poor ventilation, hazards (such as machinery and heights), able for a moderate noise intensity level; occasional interaction with the general public.

(Tr. at 16-19, Finding No. 5). At the fourth inquiry, with the assistance of a vocational expert, ALJ determined that Claimant was capable of performing past relevant work as a money counter/money room clerk. (Tr. at 19-20, Finding No. 6). Therefore, Claimant was not disabled as defined by the Social Security Act. (Tr. at 20, Finding No. 7).

### IV. <u>Claimant's Challenge to the Commissioner's Decision</u>

Claimant asserts that the ALJ erred when she found that Claimant was capable of performing her past relevant work as a money counter/money room clerk. (ECF No. 10 at

5

5-7). According to Claimant, the objective medical evidence establishes that she has carpal tunnel syndrome and osteoarthritis, which cause significant limitations in the use of her upper extremities. Given that the job duties of a money counter/money room clerk include counting, sorting, and issuing money, Claimant must be able to constantly reach, handle, finger, and feel in order to fulfill the basic requirements of the position. However, the evidence clearly corroborates her testimony that she is unable to perform these tasks on a sustained basis. Claimant contends that even the ALJ's RFC findings restrict her to jobs that require only ***frequent*** feeling; consequently, this RFC precludes her from performing her past relevant work. Finally, Claimant emphasizes that as an individual closely approaching retirement age, with a high school education and no transferable skills, the Medical-Vocational guidelines direct a finding of "disabled" in her case, unless she is capable of performing her past relevant work. Therefore, the Commissioner's decision, which is based upon the ALJ's erroneous finding, should be reversed, and the case should be remanded for a proper determination of disability under the Medical-Vocational guidelines.[1]

In response, the Commissioner asserts that Claimant's argument is based upon an incorrect factual premise; that being, that the job of money counter/money room clerk requires the ability to constantly feel. Referencing the job title of "money counter," found at 211.467-014 of the Dictionary of Occupational Titles, the Commissioner contends that the position requires constant reaching, handling, and fingering, but requires no ability to feel. *See* DICOT 211.467-014, 1991 WL 671849 (4th Ed.). Accordingly, the vocational expert was

---

[1] Claimant also mentions a sentence in the ALJ's decision that reads: "The vocational expert also testified that the claimant's residual functional capacity precludes performance of her past relevant work." (Tr. at 20). However, it is clear from the remainder of the written decision and the transcript of the hearing that this sentence contains a typographical error. As reflected in the transcript, the vocational expert opined that Claimant was capable of performing her past relevant work as a money counter/money room clerk.

correct in her conclusion that Claimant was capable of performing her past relevant work based upon the ALJ's RFC finding. In addition, the Commissioner argues that Claimant's daily activities corroborate her ability to effectively use her upper extremities. For example, Claimant prepares coffee and meals, does laundry, shops for groceries, and drives. She is also able to smoke, which requires the use of fine motor skills.

## V. Relevant Medical History

The undersigned has reviewed the evidence in its entirety, including all of the medical records. However, as the disputed issue in this case focuses on the limitations associated with Claimant's use of her upper extremities, only records relevant to her upper extremities are summarized below.[2]

### A. Treatment Records

On December 16, 2009, Claimant initiated physical therapy at Teays Valley Medicine and Rehabilitation ("TVR") for low back pain. On January 14, 2010, Claimant presented to TVR with a splint on her right hand, complaining of pain and weakness in her extremity. (Tr. at 264). On January 27, 2010, Claimant returned to TVR with continued complaints of pain in her hand and wrist, and she still wore the splint. (Tr. at 263). X-rays of her right wrist were taken, which showed no evidence of an acute fracture or dislocation. (Tr. at 327-28). Claimant still wore the splint when she returned on February 3, 2010. (Tr. at 263). On February 17, 2010, Claimant complained to her therapist of increased pain in the right hand and arm that developed the day before after she fell in her driveway. The therapist noted tenderness in Claimant's arm and shoulder, without signs of bruising. (Tr. at 262). X-rays of Claimant's right hand, wrist, and forearm were taken and revealed no convincing evidence of fracture or dislocation, although degenerative changes suggestive of

---

[2] The undersigned has not included a complete discussion of the records from Teays Valley Medicine and Rehabilitation because many of the records are illegible. (Tr. at 236-274).

7

osteoarthritis were seen in her fingers. (Tr. at 334-36). On April 1, 2010, Claimant reported to the therapist that her hands had not been hurting as badly. However, on April 29, 2010, she stated that her hands were still painful. (Tr. at 239, 257).

On October 13, 2010, Claimant saw Dr. Arvind Viradia at Cross Lanes Internal Medicine Group. (Tr. at 313-14). She told Dr. Viradia that she was having severe pain in her right hand that had gotten worse over the last year. She described the pain as radiating to her shoulder and causing her to awaken at night. She reported having been told that she had carpal tunnel syndrome. Upon examination, Claimant had a limited range of motion in her right arm, a weak grip on the right, and a positive Phalen's maneuver indicative of carpal tunnel syndrome. (*Id.*). Dr. Viradia assessed Claimant with carpal tunnel syndrome, rheumatoid arthritis or osteoarthritis, and Raynaud's disease.[3]

On October 20, 2010, Claimant underwent nerve conduction studies on her upper extremities at the request of Dr. Viradia. (Tr. at 501-04). The results were normal except for an abnormal medial-ulnar DSL difference on the right, interpreted as "a mild right median neuropathy at the wrist." The following day, Claimant told her physical therapist that her right hand was still bothering her. She was unable to close her fingers to grip. (Tr. at 246). On October 27, 2010, Dr. Viradia saw Claimant in follow-up of her nerve conduction studies. (Tr. at 306). She reported that her right hand was now continually blue and cold, and her left hand was beginning to show similar changes. Dr. Viradia noted tenderness in Claimant's right hand and joints. He also reviewed a laboratory result that reflected an elevated quantitative rheumatoid factor. As a result, Dr. Viradia diagnosed

---

[3] Raynaud's disease is a rare disorder of the blood vessels, usually in the fingers and toes. It causes the blood vessels to narrow when you are cold or feeling stressed. When this happens, blood can't get to the surface of the skin and the affected areas turn white and blue. When the blood flow returns, the skin turns red and throbs or tingles. In severe cases, loss of blood flow can cause sores or tissue death. ©MedLine Plus, National Library of Medicine, National Institutes of Health

Claimant with rheumatoid arthritis and carpal tunnel syndrome. (*Id.*). He referred her to a rheumatologist for evaluation and prescribed Lyrica, Vicoprofen, and Norvasc.

On November 11, 2010, Claimant returned for regular follow-up with Dr. Viradia. (Tr. at 305). She reported that the pain in her hands had decreased since she began taking Lyrica and Vicoprofen. However, on January 10, 2011, Claimant stated that she continued to have pain and numbness in both hands. (Tr. at 301). At a follow-up visit on February 8, 2011, Claimant reported an exacerbation of pain in her knuckles and wrists, and mentioned that she had not yet seen a rheumatologist. (Tr. at 297-98). She also complained of a painful burning neuropathy in her hands. On examination, Dr. Viradia found multiple tender spots along Claimant's hands and wrists bilaterally. By March 9, 2011, Claimant described the pain in her hands to be "unbearable," prompting Dr. Viradia to prescribe Lortab for pain relief. (Tr. at 295). Claimant's symptoms continued at her next visit on March 29, 2011, but she indicated that she was scheduled to see the rheumatologist on April 20. (Tr. at 293).

Claimant had her initial appointment with a rheumatologist, Dr. Suzanne Gharib, on April 20, 2011. (Tr. at 278-83). Claimant reported symptoms of joint pain and swelling that had started approximately two years earlier and were worsening. She described the symptoms as moderate and stated that they increased with movement and walking, although the symptoms were relieved with medication. Claimant also reported a history of carpal tunnel syndrome bilaterally, worse on the right, with associated bluish discoloration and coldness of her right hand. Dr. Gharib noted that Claimant was a long-term smoker, with chronic pulmonary disease, and that laboratory reports indicated a low positive rheumatoid factor.

On physical examination, Dr. Gharib observed that Claimant appeared alert and in no acute distress. Her sensation to light touch was intact. Claimant's wrists were not tender on palpation, and Claimant had a full range of motion, normal strength, and no appreciable joint instability. (Tr. at 281). Claimant's hands were diffusely tender to touch, and Heberden's and Bouchard's nodes were palpable.[4] Nevertheless, Claimant had a full range of motion in her finger joints, without eliciting pain, as well as normal muscle strength and joint stability. Her fingers were mildly cool to touch and had a dusky hue. Dr. Gharib diagnosed Claimant with osteoarthritis and carpal tunnel syndrome. (Tr. at 282). To control the symptoms of carpal tunnel syndrome, Dr. Gharib recommended that Claimant obtained wrist splints. Dr. Gharib also felt that Claimant might have fibromyalgia and suggested medications such as Cymbalta, Neurontin, or Lyrica. Dr. Gharib did not believe that Claimant had Raynaud's phenomenon; instead, she concluded that Claimant's smoking history may have led to thromboangiitis obliterans.[5] She urged Claimant to stop smoking. Claimant advised Dr. Gharib that she wished to discuss her treatment options with Dr. Viradia before taking any further steps. Accordingly, Dr. Gharib told Claimant to return as needed.

On April 26, 2011, Claimant presented to Dr. Viradia's office. (Tr. at 291-92). She reported that Dr. Gharib diagnosed her with osteoarthritis and fibromyalgia. She complained of hurting all over and having to stay home from work due to her pain.

---

[4] Bony bumps on the finger joint closest to the fingernail are called Heberden's nodes. Bony bumps on the middle joint of the finger are known as Bouchard's nodes. ©2005-2014 WebMD, LLC.

[5] Thromboangiitis obliterans (Buerger disease) is a rare disease in which blood vessels of the hands and feet become blocked. Thromboangiitis obliterans is caused by small blood vessels that become inflamed and swollen. The blood vessels then narrow or become completely blocked by blood clots (thrombosis). Blood vessels of the hands and feet are especially affected. This condition mostly affects young men ages 20 - 40, who are heavy smokers or chew tobacco. Symptoms of thromboangiitis obliterans may disappear if the person stops tobacco use.© 1997-2014, A.D.A.M., Inc., National Library of Medicine, National Institutes of Health

Accordingly, Dr. Viradia prescribed Lortab for Claimant's pain. Claimant continued to complain of arm and hand pain on May 26, 2011. (Tr. at 289). On July 21, 2011, Claimant advised Dr. Viradia that she was having increased anxiety and stress due to losing her job. (Tr. at 285). On that visit, she was primarily concerned with pain in her low back and legs.

On May 23, 2012, Claimant presented to Dr. Rachel Sowards for a primary care visit. (Tr. at 411-13). She reported a history of degenerative joint disease and carpal tunnel syndrome, as well as other conditions. She also provided a list of medications, although none was specifically designed to treat osteoarthritis or fibromyalgia. When asked about her musculoskeletal system, Claimant described having pain in her back, but did not complain of pain in her hands and arms. (Tr. at 412). She was diagnosed with abdominal mass, hypothyroidism, vitamin D deficiency, and depression.

Claimant returned to Dr. Soward's office on July 16, 2012, and on this visit, she complained of pain in her neck, back, hands, and feet. (Tr. at 418). On examination, Dr. Sowards found generalized tenderness in all joints and musculature. Even still, Claimant had a full range of motion, positive squeeze, and was able to make a fist with encouragement. She was noted to have Heberden's nodes. Dr. Sowards ordered x-rays of Claimant's hands and feet, as well as various laboratory tests including a rheumatoid factor. The laboratory results showed Claimant's rheumatoid factor to be within the normal range. (Tr. at 419). The x-ray of her left hand showed mild degenerative changes of osteoarthritis in the distal interphalangeal joints with moderate changes at the distal fifth joint, (Tr. at 438), while the right hand films reflected no changes in the hand since the February 2010 films. (Tr. at 437). The right hand had stable osteoarthritic changes in the distal interphalangeal joints that were mild in the second through fourth digits and moderate in the fifth digit.

### B. Agency RFC Evaluations

On September 6, 2011, Dr. Rafael Gomez completed a Physical Residual Functional Capacity Assessment of Claimant at the request of the SSA. (Tr. at 353-61). Dr. Gomez conducted a records review, which included Claimant's x-ray reports, the report of examination prepared by Dr. Gharib, Dr. Viradia's treatment notes, and Claimant's Adult Function Reports. He concluded that Claimant could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; sit, stand, or walk six hours each out of an eight hour work day; and had unlimited ability to push and pull. He suggested some postural limitations. Claimant should never climb ladders, ropes, and scaffolds, and should only occasionally climb stairs and ramps; balance; sto0p; kneel; and crouch. He opined that Claimant had unlimited ability to reach in all directions, handle, and finger, but could only frequently feel due to her carpal tunnel syndrome. According to Dr. Gomez, Claimant had no visual or speaking limitations, but her ability to hear was somewhat limited due to bilateral hearing loss. From an environmental standpoint, Dr. Gomez recommended that Claimant avoid concentrated exposure to extreme heat and cold, vibrations, fumes, odors, dusts, gases, and hazards. In conclusion, he felt Claimant was credible and had a reduced RFC. He thought Claimant should be restricted to light exertional work with the other noted limitations.

On October 20, 2011, Dr. Caroline Williams provided a second RFC opinion after conducting a records review. She noted that Claimant's condition had not changed since Dr. Gomez's assessment, and she agreed with his opinions. (Tr. at 380-88).

## VI. Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence.

*See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775.

## VII. <u>Discussion</u>

Claimant contends that the ALJ erroneously found her to be capable of performing her past relevant work as a money counter/money room clerk, and offers a two-pronged argument in support of her position. First, she claims that the Dictionary of Occupational Titles ("DICOT") describes the duties of a money counter to include counting, sorting, and issuing money. *See* DICOT 211.467-014. Given these duties, common sense dictates that a money counter must be able to reach, handle, finger, and feel constantly.[6] However, Dr. Gomez restricted Claimant to occupations that require no more than frequent[7] feeling,

---

[6] The DICOT defines "constantly" as at least two thirds of the work day.

[7] The DICOT define "frequently" as one third to two thirds of the day.

13

which is insufficient to fulfill the job requirements of money counter. Because the ALJ adopted Dr. Gomez's RFC assessment, Claimant is not capable of performing her past relevant work. If Claimant is not capable of performing her past relevant work, the Medical-Vocational guidelines direct a finding that she is disabled. Therefore, the ALJ was incorrect in finding that Claimant is not disabled.

Claimant's argument is unpersuasive because, as the Commissioner aptly points out, it is based upon a faulty factual premise. The parties agree that the position of money counter, Title 211.467-014 of the DICOT, is the appropriate occupational title to describe Claimant's past relevant work. The strength, reasoning, math, and language requirements of Title 211.467-014, as well as its specific vocational preparation and limits, tolerances, and standards, are set forth at 1991 WL 671849. According to the DICOT, a money counter must be able to reach, handle, and finger constantly; however, a money counter is not required to feel. (*Id.*). Despite Claimant's beliefs to the contrary, feeling is simply unnecessary for tasks like sorting and counting. Indeed, many individuals in occupations that involve counting large sums of money (such as bank tellers) wear rubber finger tips for efficiency and to reduce paper cuts. Accordingly, Dr. Gomez's RFC assessment, which was adopted by the ALJ, does not preclude Title 211.467-014 as a viable occupation. Similarly, the opinion of the vocational expert that Claimant could perform her past relevant work was entirely consistent with the DICOT.

In the second prong of her argument, Claimant stresses that the evidence of record predominates in her favor. She claims that the evidence unequivocally demonstrates her inability to perform past relevant work given her severe manipulative limitations. Accordingly, the ALJ's decision is not supported by substantial evidence.

Under the disability rules and regulations, substantial evidence is evidence that a reasoning mind would consider sufficient to support a particular conclusion. For evidence to be substantial, it must be more than a mere scintilla, but may be less than a preponderance. When applying this evidentiary standard, the undersigned finds that the second prong of Claimant's argument is likewise without merit. *Blalock*, 483 F.2d at 776.

Claimant presented medical evidence that she suffered in both hands from carpal tunnel syndrome, osteoarthritis and either Raynaud's disease or thromboangiitis obliterans. She also complained of severe pain, tingling, numbness, discoloration, and coldness in her hands and fingers. In light of this evidence, the ALJ acknowledged that Claimant had severe impairments involving her upper extremities. Nonetheless, when assessing the functional impact of those impairments on Claimant's ability to do work-related functions, the ALJ concluded that they were not disabling. As reflected in her written decision, the ALJ's conclusion was based upon objective medical findings, an assessment of the reliability of Claimant's statements, and the medical source opinions.

First, the ALJ reviewed the objective medical evidence, noting that x-rays taken of Claimant's hands and wrists showed only mild to moderate osteoarthritis. In addition, Dr. Gharib performed a thorough examination of Claimant hands and found only diffuse tenderness and mild coolness. The remainder of Dr. Gharib's examination, including range of motion, muscle strength, and joint stability, was completely normal. (Tr. at 18). The ALJ highlighted the routine and conservative nature of Claimant's treatment, and emphasized that when Claimant took medication for the pain in her hands, the medication effectively controlled her symptoms. The ALJ also observed that Claimant had been prescribed splints to relieve symptoms related to her carpal tunnel syndrome, but she did not wear them. Although Claimant maintained that the splints were too large, she conceded that she had

15

failed to obtain new ones. Therefore, the objective evidence did not substantiate a disabling upper extremity impairment.

Next, the ALJ evaluated Claimant's credibility, since her statements regarding the intensity and severity of her symptoms did not correspond with the rather mild objective medical findings. The ALJ noted that Claimant had a steady work record until July 2011; however, the primary reason Claimant stopped working at that time was because her employment was terminated, and not because of a disabling condition. The ALJ pointed out inconsistencies in Claimant's testimony regarding the filling of prescriptions, indicating that Claimant originally stated that she did not fill certain prescriptions due to a lack of funds, but then later admitted she had Medicaid and did not fill the prescriptions because she lacked transportation. In addition, the ALJ discussed Claimant's daily activities, which included preparing meals, doing laundry, sweeping floors, and washing dishes, noting that they contradicted her statements of debilitating upper extremity symptoms. Thus, the ALJ found Claimant to be less than credible, observing that neither the objective evidence nor Claimant's daily activities corroborated her subjective descriptions of severe pain. In regard to Claimant's smoking, the ALJ found that Claimant had sufficient manual dexterity to continue with that habit, which undermined her allegations of significant manipulative restriction. Moreover, Claimant continued to smoke even after she had been counseled by Dr. Gharib that smoking exacerbated her medical conditions. (Tr. at 17-19).

Finally, the ALJ considered the opinions of Dr. Gomez and Dr. Williams. (Tr. at 19). The ALJ acknowledged that the physicians were non-examining sources, but afforded their opinions special weight based upon their knowledge of the program, familiarity with the case record, and their reliance on evidence in the record to support their opinions.

Consequently, the ALJ had good reason to adopt the RFC assessment of Dr. Gomez, which was confirmed by Dr. Williams. In the assessment, Dr. Gomez determined that Claimant had some limitation in her ability to feel, but had no limitations related to reaching, handling, and fingering. Notably, no medical source statement in the record contradicts Dr. Gomez's opinions.

Therefore, considering the record as a whole, the undersigned **FINDS** that the ALJ's RFC assessment was supported by substantial evidence. The undersigned further **FINDS** that Claimant's RFC did not preclude her from performing her past relevant work. Finally, the undersigned **FINDS** that the ALJ followed applicable rules and regulations when she relied upon the opinion of the vocational expert. The expert's testimony was based upon a complete hypothetical question and was consistent with the Dictionary of Occupational Titles.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's motion for judgment on the pleadings as articulated in her supporting memorandum, (ECF Nos. 10), **GRANT** Defendant's motion for judgment on the pleadings, (ECF No. 11), **DISMISS** this action, **with prejudice,** and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing

this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: January 9, 2014.

_____
Cheryl A. Eifert
United States Magistrate Judge